UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**IN RE APPLICATION OF USA PURSUANT TO 18 U.S.C. 3512 FOR SEARCH OF INFORMATION ASSOCIATED WITH ONE FACEBOOK PROFILE STORED AT PREMISES CONTROLLED BY FACEBOOK, INC.**

ML No. _____

*Reference:      DOJ Ref. # CRM-182-64504; Subject Account: 100020988577071*

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Michael Vahidtari, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook profile (the "account") that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking company headquartered at 1601 Willow Road, Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A), and 3512(a), to require Facebook to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      The information requested in this search warrant is being sought pursuant to a request for assistance (the "request") from the Ministry of Justice of the State of Israel ("Israel") to the United States Department of Justice.  Israeli authorities are investigating murder offenses, which occurred on or about March 28, 2018, in violation of the criminal laws of Israel, specifically, Section 300(a)(2) of Israel's Penal Law 5737-1977.  Copies of the applicable laws are appended to this affidavit.  This Request is made pursuant the Treaty between the Government of the United States of America and the Government of the State of Israel on Mutual Assistance in Criminal Matters, U.S.-Isr., Jan 26, 1998, S. TREATY DOC. NO. 105-40 (1998) (hereinafter, the "Treaty"), to execute a request from Israel.  Under the Treaty, the United States is obligated to render assistance in response to this Request.

3.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2010.  I am currently assigned to the International Operations Division, Mutual Legal Assistance Treaty Unit, in Washington, D.C.  My current duties include responding to requests from foreign governments pursuant to mutual legal assistance treaties, including serving as the affiant on search warrant affidavits, serving search warrants, and reviewing the data received in response thereto for relevance in compliance with the parameters of the search warrants. During my employment with the FBI, I have conducted investigations related to violent crimes (including kidnappings, fugitive investigations, and bank robberies) and national security (including counter-terrorism).  I have experience in the execution of search warrants and the analysis of collected evidence.

4.      The facts set forth in this affidavit are based upon information conveyed to the United States via the request by Israeli authorities and upon my training and experience.  This

affidavit is intended to show merely that there is sufficient probable cause for the requested

warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that violations of the criminal laws of Israel have been

committed by Mario Jorge Martinez ("Martinez").  There is also probable cause to search the

information described in Attachment A for evidence, instrumentalities, contraband or fruits of

these crimes further described in Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711.  *See* 18 U.S.C. § 2703(a), (b)(1)(A) &

(c)(1)(A).  Specifically, the Court "is acting on a request for foreign assistance pursuant to

[18 U.S.C.] section 3512 . . . ."  18 U.S.C. § 2711(3)(A)(iii); *see also* 18 U.S.C. § 3512(a)(2)(B)

(court may issue "a warrant or order for contents of stored wire or electronic communications or

for records related thereto, as provided under section 2703"), § 3512(c)(3) ("application for

execution of a request from a foreign authority under this section may be filed . . . in the District

of Columbia").

7.      This application to execute the request has been approved and duly authorized by

an appropriate official of the Department of Justice, through the Office of International Affairs

("OIA").[1]  *See* 18 U.S.C. § 3512(a).  An OIA attorney has reviewed the request, confirmed that it

---

[1] The Attorney General, through regulations and Department of Justice directives, has delegated to the Office of International Affairs the authority to serve as the "Central Authority" under treaties and executive agreements between the United States and other countries pertaining to mutual assistance in criminal matters.  *See* 28 C.F.R. §§ 0.64-1, 0.64-4, and Appendix to Subpart K, Directive Nos. 81A and 81B (2015).

was submitted by Israeli authorities in connection with a criminal investigation and/or

prosecution, and authorized the undersigned to file this application.

## **PROBABLE CAUSE**

8.      Israeli authorities allege that, on March 28, 2018, Martinez murdered his former

spouse ███████████ (the "victim") at a restaurant in Tel-Aviv, Israel, that the couple

continued to co-manage following their breakup (the "restaurant").

9.      According to Israeli authorities, at approximately 16:47 on March 28, 2018, the

Israeli National Police (the "INP") received a call from Martinez.  During the call, Martinez

reported the victim's death and admitted to having murdered her.  INP responding officers

arrived at the restaurant shortly following the call and found the victim's body, which had

sustained a number of stab wounds primarily in her torso, back, and left leg.  The victim was

dead at the time of the INP's arrival.  Israeli authorities believe that the victim was stabbed with

a butcher's knife and that she died as a result of hypovolemic shock triggered by the stabbing.

10.     When questioned, Martinez admitted to the INP that he had called the victim prior

to the murder and had asked the victim to meet him at the restaurant.  The INP seized Martinez's

mobile phone and reviewed its outgoing call history, finding that, at 15:46, Martinez had used his

phone to make an outgoing call to the victim's daughter's mobile phone.  In a statement taken

following the murder, the victim's daughter confirmed that her mobile phone was installed in the

victim's car and that Martinez was aware of that fact.

11.     The INP reviewed the available footage from the CCTV system installed at the

restaurant for the night of March 28, 2018, finding that it showed Martinez (a) arriving at the

restaurant at approximately 15:47, and (b) shortly thereafter, standing beside the CCTV controls

immediately before the CCTV system was disabled.  Accordingly, the INP believes that

Martinez disabled the restaurant's CCTV system after calling the victim on her daughter's phone but prior to the victim's arrival at the restaurant.

12.     During the course of the investigation, a witness also advised the INP that Martinez changed the status marked on his Facebook profile (**User ID 100020988577071**) to "Widowed" several hours prior to the murder.  Israeli authorities subsequently obtained IP access logs from Facebook for **User ID 100020988577071**, which reflected that the profile was accessed on March 28, 2018.  Martinez alleges that the victim's murder was a spontaneous act and was not premeditated.   Accordingly, Israeli authorities now seek records relating to Martinez's use of his Facebook profile to assist establishing that, at least several hours prior to the victim's death, Martinez intended to become a widow (*i.e.*, anticipated the victim's imminent death).

## BACKGROUND CONCERNING FACEBOOK

13.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  The website was launched on February 4, 2004, and is owned and operated by Facebook, Inc.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

14.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal

identifiers.  Facebook also assigns a user-identification number to each account.  Facebook

identifies unique Facebook accounts by a user's e-mail address, the user-identification number,

or the username associated with a Facebook profile.

15.     Facebook users may join one or more groups or networks to connect and interact

with other users who are members of the same group or network.  Facebook assigns a group

identification number to each group.  A Facebook user can also connect directly with individual

Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request"

accepts the request, then the two users will become "Friends" for purposes of Facebook and can

exchange communications or view information about each other.  Each Facebook user's account

includes a list of that user's "Friends" and a "News Feed," which highlights information about

the user's "Friends," such as profile changes, upcoming events, and birthdays.

16.     Facebook users can select different levels of privacy for the communications and

information associated with their Facebook accounts.  By adjusting these privacy settings, a

Facebook user can make information available only to himself or herself, to particular Facebook

users, or to anyone with access to the Internet, including people who are not Facebook users.  A

Facebook user can also create "lists" of Facebook friends to facilitate the application of these

privacy settings.  Facebook accounts also include other account settings that users can adjust to

control, for example, the types of notifications they receive from Facebook.

17.     Facebook users can create profiles that include photographs, lists of personal

interests, and other information.  Facebook users can also post "status" updates about their

whereabouts and actions, as well as links to videos, photographs, articles, and other items

available elsewhere on the Internet.  Facebook users can also post information about upcoming

"events," such as social occasions, by listing the event's time, location, host, and guest list.  In

addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

18.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

19.     Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

20.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

21.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

22.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

23.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

24.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

25.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

26.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

27.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

28.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic

context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

29.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## CONCLUSION

30.     Based on the forgoing, I request that the Court issue the proposed search warrant.

31.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

32.     Because the warrant will be served on Facebook, Inc. who will then compile the requested records and information at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

10

_____
Michael Vahidtari
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on _____, 201___


_____

UNITED STATES MAGISTRATE JUDGE

**Annex**

**Applicable Provisions of Israel's Penal Law**

**Murder**

300. (a) If a person did one of the following, then he shall be accused of murder and is liable to life imprisonment, and only to that penalty:

* * *

    (2) he caused the death of an person with premeditation . . .

**<u>ATTACHMENT A</u>**
**Property to Be Searched**

This warrant applies to information associated with Facebook User ID **100020988577071** that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.      Information to be disclosed by Facebook, Inc. (the "Provider") to facilitate
execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of the Provider, including any messages, records, files, logs, or other

information that have been deleted but is still available to the Provider, or has been preserved

pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the

following information to the government for each account or identifier listed in Attachment A

(the "Account"):

(a)      The contents of any available messages or other communication associated with

the Account (including, but not limited to, messages, attachments, draft messages,

posts, chats, video calling history, Friend requests, discussions, recordings,

images, or communications of any kind sent to and from the Account, including

stored or preserved copies thereof), the source and destination addresses and all IP

addresses associated with each message or other communication, the date and

time at which each message or other communication was sent, and the size and

length of each message or other communication, for the period from March 27,

2018, through and including March 28, 2018;

(b)      All photos and videos uploaded by the Account and all photos or videos uploaded

that have the Account tagged in them, including Exchangeable Image File

("EXIF") data and any other metadata associated with those photos and videos,

for the period from March 27, 2018, through and including March 28, 2018;

(c)     All records or other information regarding the identification of the Account, to
include full name, physical address, telephone numbers, birthdate, security
questions and passwords, and other personal identifying information, records of
session times and durations, the date on which the Account was created, the
length of service, types of services utilized by the Account, the IP address used to
register the Account, log-in IP addresses associated with session times and dates,
account status, alternative e-mail addresses provided during registration, methods
of connecting, log files, and means and source of payment (including any credit or
bank account number);

(d)     All records or other information, including address books, contact and Friend
lists, calendar data, and files; profile information; News Feed information; Wall
postings; Notes; groups and networks of which the Account is a member; future
and past event postings; rejected "Friend" requests and blocked users; status
updates (including relationship status updates); comments; gifts; pokes; tags; the
account's usage of the "Like" feature, including all Facebook posts and all non-
Facebook webpages and content that the user has "liked"; searches performed by
the Account; privacy settings, including privacy settings for individual Facebook
posts and activities; information about the Account's access and use of Facebook
applications; and the Account's access and use of Facebook Marketplace for the
period from March 27, 2018, through and including March 28, 2018;

(e)     All "check ins" and other location information for the period from March 27,
2018, through and including March 28, 2018; and

(f)    All records pertaining to communications between the Provider and any person regarding the Account, including contacts with support services and records of actions taken for the period from March 27, 2018, through and including March 28, 2018.

The Provider shall deliver the information set forth above via United States mail or courier to:  Supervisory Special Agent Robert C. Basanez, Federal Bureau of Investigation, J. Edgar Hoover Building, MLAT Unit, Room 7848, 935 Pennsylvania Avenue, NW, Washington D.C. 20535-0001 or e-mail to HQ_ISP_MLAT_Returns@FBI.gov.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of murder offenses in violation of the criminal laws of Israel, specifically, Section 300(a)(2) of Israel's Penal Law 5737-1977, including, for the account or identifier listed on Attachment A (the "Account"), information pertaining to the following matters:

(a) Files, documents, video, photographs, recordings, images, messages, chats, status updates, posts or any other communications of any kind involving the Account or activity of any kind involving the Account concerning the circumstances that led to the Victim's murder and/or the relationship between the victim and Mario Jorge Martinez;

(b) Evidence indicating the state of mind of the owners of the Account, *e.g.* intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(c) Evidence indicating how, when, and where the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the owners of the Account; and

(d) The identity of the person(s) who created or used the Account, including records that help reveal the whereabouts of such person(s).

### III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the Provider and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States and shared with appropriate foreign authorities.

Law enforcement personnel will then seal any information from the Provider that does not fall within the scope of Section II and will not further review the information absent an order of the Court.